UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>RAZVAN MARCU,<br><br>  Defendant. | Case No. 2:14-cv-00159-RFB-CWH<br><br>**OPINION & ORDER**<br><br>Plaintiff's Motion for Summary Judgment<br>(Dkt. No. 57) |

## I.     INTRODUCTION

Before the Court is Plaintiff's Motion for Summary Judgment. (Dkt. No. 57). For the reasons elaborated below, the motion is GRANTED.

## II.    BACKGROUND

The United States filed a Complaint requesting the Court to revoke Marcu's citizenship, pursuant to 8 U.S.C. § 1451(a), on January 29, 2014. A federal district court has the power to revoke an individual's citizenship for either of two grounds: (1) if naturalization was illegally procured, or (2) if naturalization was procured by concealment or willful misrepresentation of material fact. Marcu filed a Motion to Dismiss, which the Court denied at a hearing on September 24, 2015. The United States filed the present Motion for Summary Judgment on October 20, 2015, (Dkt. No. 57). Defendant filed a Response on November 19, 2015, (Dkt. No. 68), and Plaintiff filed a Reply on December 7, 2015, (Dkt. No. 70).

### A. Undisputed Facts

The Court incorporates its findings of fact and discussion of the factual background from its hearing on September 23, 2016.

The Court finds the following facts to be undisputed. Razvan Marcu was born in Romania in 1977. Prior to his naturalization, Marcu was a native and citizen of Romania. Marcu

married a U.S. citizen, Catherine Paulette Carlisle, in Romania on January 31, 2004, and on November 25, 2005, he was admitted to the United States as a conditional lawful permanent resident as the spouse of a U.S. citizen.

On September 15, 2008, Marcu filed his Application for Naturalization. As part of the application, he was asked to answer whether he had ever committed a crime or offense for which he was not arrested. In response, Marcu checked "No." Marcu was also asked whether he had ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal. In response, Marcu checked "No." On September 10, 2008, Marcu signed his immigration form under penalty of perjury. On January 16, 2009, Immigration Officer Aaron Ingelby interviewed Marcu to determine his eligibility for naturalization. Under oath, Marcu affirmed the information in his immigration form under penalty of perjury. Based on this information, his naturalization application was approved on January 16, 2009. On February 20, 2009, Marcu attended a naturalization ceremony in the U.S. District Court for the District of Arizona. Prior to the oath of allegiance, Marcu completed a "Notice of Naturalization Oath Ceremony," on which a question asked whether, since the date of his naturalization interview, he had knowingly committed any crime or offense for which he had not been arrested. In response, Marcu checked "No." On February 20, 2009, Marcu was admitted as a citizen of the United States and received his certificate of naturalization.

On July 30, 2012, in the U.S. District Court for the Southern District of New York, Marcu pled guilty to the felony charge of conspiracy to commit wire fraud. 18 U.S.C. § 1343; 18 U.S.C. § 1349. The superseding indictment in that case provides the factual basis for the felony, and describes a scheme beginning on or about 2008, up to about 2011, in which Marcu participated to defraud individuals seeking to purchase items on the internet. A purchaser would contact a supposed seller over the Internet, and once the terms of the sale were agreed upon, a fraudulent electronic mail message would be sent to the purchaser asking him or her to wire money to a person or bank account. The money would be withdrawn and no item would ever be sent. The money would then be transmitted to co-conspirators.

In his plea colloquy, Marcu admitted to participating in an automobile purchasing wire fraud conspiracy, as a facilitator between an individual named Tim Harron and co-conspirators in Romania. He stated in that colloquy that his involvement in the scheme lasted from 2009 to 2011. At a sentencing hearing, Marcu admitted to participating in acts of wire fraud on January 29 and 30, 2009, and February 3 and 4, 2009. The hearing was held subsequent to defendant's guilty plea, to determine the number of victims of the conspiracy, and whether the defendant knew or reasonably should have known of that number. (Dkt. No. 59, Pl's Ex. N). At the hearing, Marcu admitted to receiving wire transfers from Deborah Bruner and Joseph Kubicek, victims of the conspiracy, to his Washington Mutual bank account to pay for cars they did not receive, which he then withdrew in cash and distributed to members of the conspiracy. Marcu argued to the sentencing court that it should only consider his involvement to have begun in early part of 2009 in January and/or February. The sentencing court accepted and relied upon this argument in imposing sentence. The government has provided evidence of transfers from Bruner and Kubicek to Marcu's personal bank account, as well as withdrawals, on those dates, that were part of the conspiracy he pled to. They have also provided evidence of the fake emails from E-Bay that Bruner and Kubicek received regarding auto purchases.

### III. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007)

(alteration in original) (internal quotation marks omitted). A genuine issue exists, precluding summary judgment, so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### IV. ANALYSIS
#### A. Legal Standard for Denaturalization Proceedings

Under 8 U.S.C. § 1427(a), an applicant for citizenship must demonstrate that he has been a person of good moral character for the requisite statutory period before he files his naturalization application, and continuing until he becomes a naturalized citizen. The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(f), bars an applicant from establishing good moral character for a number of enumerated reasons, including if the applicant committed a crime involving moral turpitude ("CIMT") during the statutory period and has either been convicted of, or admits committing, such offense. Once citizenship has been conferred, "To prevail in a denaturalization proceeding, the government must prove its case by clear, convincing, and unequivocal evidence, and leave no issue in doubt." Klapprott v. United States, 335 U.S. 601, 612 (1949). "The government bears the burden of such a high degree of proof in denaturalization proceedings because of the 'importance of the right that is at stake.'" United States v. Arango, 670 F.3d 988, 992-93 (9th Cir. 2012). When a court determines that the government has met its burden of proving that a naturalized citizen obtained his citizenship illegally, or by willful misrepresentation, it must enter a judgment of denaturalization. Fedorenko v. Unites States, 449 U.S. 490, 517 (1981).

#### B. Argument 1: Illegal Procurement of Citizenship Under 8 U.S.C. § 1451(a)(1)
##### 1. Lack of "Good Moral Character" Under 8 U.S.C. § 1101(f)'s Catch-All Provision

The United States argues that before Marcu became a citizen, and during the period when he was required to establish good moral character, he was involved in a conspiracy to commit wire fraud, having committed criminal acts related to the conspiracy to which he pled guilty after naturalization. The required statutory period for good moral character for applicants who seek

naturalization based on marriage to a U.S. Citizen, as Marcu did, begins three years prior to the filing of the application, until the date of the oath of allegiance to become a U.S. citizen. See 8 U.S.C. 1427(a); 8 U.S.C. 1430(a); 8 C.F.R. 316.10(a)(1). Marcu was required to establish that he was, and continued to be, a person of good moral character from September 15, 2005, three years before he filed his application for naturalization, until February 20, 2009, the date he was naturalized. Section 1101(f) of the INA precludes an individual from establishing good moral character if that individual falls within certain enumerated classes, or has committed unlawful acts which adversely reflect on his moral character. 8 U.S.C. § 1101(f)(1)-(9).

The government argues that under § 1101(f)'s catch-all provision, Marcu lacked good moral character during the statutory period. The INS' regulations, pursuant to this provision, state that a naturalization applicant "shall be found to lack good moral character if…the applicant…committed unlawful acts that adversely reflect upon the applicant's good moral character, or was convicted or imprisoned for such acts," unless the applicant "establishes extenuating circumstances." 8 C.F.R. 316.10(b)(3)(iii). Although Marcu was not convicted during the statutory period, he maintained at his criminal sentencing that his involvement, withdrawing the wire transfers in cash from his personal bank account, began with two wire transfers in January 2009, and that he participated in the fraudulent scheme until his arrest in 2011.

In the instant matter, Marcu alleges in a deposition that the January 2009 transactions were not part of the conspiracy, and that they were merely related to a favor for a friend, who wanted to store money in Marcu's bank account. He states that he agreed to receive the transactions into his personal bank account because his friend had credit card debt and wanted to hide his money from the bank and credit card company. Marcu also admits to being compensated for the two transactions in January and February 2009. This most recent representation contradicts the testimony of Marcu's counsel at his earlier sentencing hearing in his criminal matter, and is the first time Marcu is raising an argument that he was unaware at the time of the January 2009 transfers that they were related to the conspiracy. Marcu's counsel unequivocally stated at the criminal sentencing hearing that "the dates are January of 2009 and February of

- 5 -

2009 which is, from our point of view, the beginning of this scheme." (Dkt. No. 59, Pl's Ex. N. at 242). "[C]riminal defendants are bound by the admissions of fact made by their counsel in their presence." United States v. Hernandez, 431 F.3d 1212, 1219 (9th Cir. 2005).

In January and February of 2009, Marcu received wire transfers from Deborah Bruner and Joseph Kubicek to his Washington Mutual bank account to pay for cars they did not receive. He withdrew the transfers in cash and distributed it to members of the conspiracy, keeping a fraction of the money for himself. The government has provided evidence of transfers from Bruner and Kubicek to Marcu's personal bank account, as well as withdrawals, on those dates. They have also provided evidence of the fake emails from E-Bay that Bruner and Kubicek received regarding automobile purchases. There is also sworn testimony from Marcu's co-conspirator, Harron, that the two met in January 2009 to discuss the fraudulent scheme. Other than his deposition statements in the instant case, which contradict his representations during sentencing, under oath, at his criminal case, Marcu has provided no evidence to dispute his knowing entrance into the conspiracy in January 2009. "'[C]onclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence,' are insufficient to create a genuine issue of material fact." See Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055, 1063-64 (9th Cir. 2012) (quoting F.T.C. v. Publ'g Clearing House Inc., 104 F.3d 1168, 1171 (9th Cir. 1997)). Marcu is bound by his attorney's unequivocal admissions at his sentencing proceeding, (and evidence from multiple other sources) which are sufficient to establish that, in at least January 2009, within the statutory period, Marcu committed unlawful acts which adversely reflect on his moral character. He was, thus, ineligible for naturalization in February 2009.

Defendant argues that during his plea colloquy in his criminal case, Judge Patterson of the Southern District of New York expressly asked the U.S. Attorney if Marcu could be deported based on his conviction. In response, the U.S. Attorney stated, "The government understands that the defendant is a U.S. citizen, your Honor." Marcu contends that he relied upon this representation in entering his guilty plea, and the government should therefore be estopped from pursuing denaturalization. The government argues that it did not make any promises to Defendant regarding potential denaturalization. Two bail memoranda by the government were

filed in his criminal case on August 8, 2011, and February 29, 2011, that stated, "While the defendant became a naturalized U.S. citizen in 2009, his citizenship is now at risk, because in his paperwork he falsely stated that he had not committed any crimes for which he had not been arrested since becoming a lawful permanent resident." Furthermore, it is the Defendant's counsel's duty, not the government's, to inform him of deportation consequences. See Padilla v. Kentucky, 559 U.S. 536, 374 (2010). The Court consequently does not credit Marcu's argument that the government is estopped from pursuing denaturalization.

Therefore, the Court finds that under 8 U.S.C. § 1101(f)'s catch-all provision, Marcu committed unlawful acts which adversely reflect upon his moral character, and was thus ineligible for naturalization in February 2009.

### 2. Lacking "Good Moral Character" Under 8 U.S.C. § 1101(f)(3)'s Crime Involving Moral Turpitude Provision

The United States argues that 8 U.S.C. § 1101(f)(3) provides an independent ground for Marcu's ineligibility for citizenship in February 2009. Under that provision, individuals who have committed acts which constitute the essential elements of a Crime Involving Moral Turpitude ("CIMT"), and are either convicted of the CIMT or admit commission of the act, are precluded from establishing good moral character.

Although Marcu was not convicted of his felony within the statutory period, pursuant to the Court's factual analysis, supra, he admitted to having committed the act of wire fraud in at least January 2009. Based on his guilty plea, Marcu was convicted of a felony of conspiracy to commit wire fraud, which constitutes a CIMT. The Supreme Court and the Ninth Circuit have held that crimes involving fraud categorically qualify as CIMTs. Jordan v. De George, 341 U.S. 223, 229 (1951); Planes v. Holder, 652 F.3d 991, 997-98 (9th Cir. 2011). Wire fraud requires "the existence of a scheme to defraud" and "a specific intent to defraud." See United States v. Jinian, 725 F.3d 954, 960 (9th Cir. 2013). A conviction for a conspiracy is also a CIMT if the underlying crime is a CIMT. Barragan-Lopez v. Mukasey, 508 F.3d 899, 903 (9th Cir. 2007). Therefore, when Marcu pled guilty to a conspiracy to commit wire fraud, he pled guilty to having the specific intent to defraud, and to the commission of a CIMT. At his sentencing

hearing, his attorney explicitly and unequivocally set the date of initiation of Marcu's role in the conspiracy at January 2009: "[T]he dates are January of 2009 and February of 2009 which is, from our point of view, the beginning of this scheme." (Pl.'s Ex. N at 242).

Therefore, the Court finds that under 8 U.S.C. § 1101(f)(3), Marcu committed acts which constituted the essential elements of a Crime Involving Moral Turpitude, and was thus ineligible for naturalization in February 2009.

### C. Argument 2: Procurement of Citizenship by Willful Misrepresentation or Concealment of a Material Fact Under 8 U.S.C. § 1451(a)(2)

The United States further argues that Marcu obtained his naturalization by concealing and willfully misrepresenting his criminal activity during his naturalization proceedings, and that this misrepresentation constitutes an independent ground for the Court to revoke Marcu's naturalization.

A misrepresentation or concealment is material to one's naturalization if the misrepresentation "has a natural tendency to produce the conclusion that the applicant was qualified" to naturalize. Kungys v. United States, 485 U.S. 759, 770 (1988). A misrepresentation is considered "willful" if it is "deliberate and voluntary." Espinoza-Espinoza v. Immigration and Naturalization Servs., 554 F.2d 921, 925 (9th Cir. 1977). Knowledge that the information is false, as opposed to a specific intent to deceive the decision-maker, is sufficient to establish willfulness. Forbes v. Immigration and Naturalization Servs., 48 F.3d 439, 442 (9th Cir. 1995).

In this case, Marcu has admitted to knowingly committing acts of wire fraud on January 29 and January 30, 2009, prior to submitting his Form N-445 and prior to taking his oath of allegiance at his naturalization ceremony on February 20, 2009. At this ceremony, Marcu answered, "no", to the question: "After the date you were first interviewed on your Application for Naturalization, Form N-400…have you knowingly committed any crime or offense, for which you have not been arrested?" Therefore, Marcu willfully misrepresented and concealed his material criminal actions during his naturalization proceedings, and the Court holds, in the alternative, that Marcu's procurement of citizenship by willful misrepresentation and concealment is grounds to revoke his naturalization under 8 U.S.C. § 1451(a)(2).

## V.     CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment is **GRANTED** [Dkt. No. 57], and the Court enters a judgment of denaturalization against Razvan Marcu.

**IT IS FURTHER ORDERED** that the Clerk is instructed to close this case.

**DATED** this 26th day of September, 2016.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**